KLEIN, Adm. J.,
— The second account of Fidelity-Philadelphia Trust Company (now The *699 Fidelity Bank), trustee under the will of James G. Barnwell, was originally called for audit March 1,1965.
In the statement of proposed distribution the accountant requests the guidance of the court as to the area of permissible expenditures. This problem, referred to on many occasions as a request for “guidelines,” has been the primary concern of the court since the present account was filed.
To place the matter in perspective, a history of the trust will be helpful. James G. Barnwell died February 23, 1919, leaving a will dated July 15, 1905, which was admitted to probate February 28, 1919, when letters testamentary were granted. After making a number of gifts, testator made the following disposition of his residuary estate:
“Whatever reputation and success I have attained, however moderate, being the result, under Providence of two causes, First, the training of a good mother who always inculcated and practised the highest principles of honor and especially of moral courage regardless of immediate or apparent results and Secondly, to the education which I received in the Public Schools of Philadelphia and especially in the Central High School, I wish to honor the memory of that mother by practically encouraging and rewarding the practise of the same high principles by the Students and Graduates of the School. Accordingly, I expect hereafter by one or more codicils to this my last will to make devises, bequests or endowments by the creation of trusts or otherwise to carry out this purpose the details of which I have not fiilly matured, but knowing the uncertainty of human life, I have made this will without waiting to complete such plans; and in the event of my decease before duly executing such codicil or codicils, then I authorize and direct my executor, hereinafter named, at his discretion, to sell or dispose of any or all of my residuary estate and invest the *700 proceeds thereof in lawful securities and expend the net income arising therefrom in such ways as in his judgment will best carry out the foregoing purpose, and in such case I further authorize and empower my executor aforesaid to make in his discretion permanent provision for the endowment and support of such purpose by Deed of Trust, by Will or otherwise and I further authorize him to execute any and all legal instruments necessary or proper to carry into effect this purpose and any or all of the other provisions of this my Will.”
Unfortunately, Barnwell did not clarify his intentions by codicil or in any other way before he died.
The validity of this trust was upheld in Barnwell Estate, 269 Pa. 443 (1921). Since September 1921, the trust has been administered under a plan calling for an advisory committee consisting of the president or vice president of the Fidelity Bank, the accountant, the president or vice president of Central High School, or a faculty member designated by him, and the president of the alumni association of the school, whose duty it would be to recommend to the trustee appropriate projects and programs for the use of the income from the trust.
The trustee’s first account and two supplements thereto were called for audit before Judge Hunter on January 3,1949, and an adjudication was filed January 21, 1949, in which the auditing judge adopted the findings of the trustee ad litem, Leon J. Obermayer, Esq., to the effect that the expenditures theretofore made from income fell within the purposes intended by testator.
A hearing on the present account was held on March 24, 1965. Thereafter, Judge Burke, by decree dated June 1, 1965, appointed Cuthbert H. Latta, Esq., amicus curiae “to assist the Court in the formu *701 lation of guidelines for the future administration of the . . . trust . . . . Some time later, Mr. Latta resigned and A. David M. Speers, Esq., was appointed in his stead by decree dated November 7, 1966. Mr. Speers filed his report on July 24, 1967. At the suggestion of Paul Maloney, counsel for the trustee, Judge Burke, by decree dated November 16, 1967, authorized the trustee to employ outside consultants to make recommendations as to suitable projects and programs for which the income of this trust could properly be used within the terms of Barnwell’s will. Before the report of the consultants was submitted, Mr. Speers died and by decree dated August 20, 1968, Seymour C. Wagner, Esq., was appointed in his stead.
Mr. Wagner filed his report on September 17, 1969, and the account was placed on Judge Burke’s deferred list for April 6, 1970. Judge Burke died before acting on this matter. The case was thereupon referred to the present auditing judge, who directed the amicus curiae to hold further hearings and consider proposals from all interested parties concerning the proper uses to which these funds might be applied. This was done to enable the amicus curiae to bring this complicated matter to a conclusion and to develop for the court’s consideration a set of “guidelines” that would:
1. Provide the trustee with the kind of counseling it was seeking,
2. Bear a recognizable relationship to the purposes intended by testator, and
3. Be broad enough to absorb all of the income generated by the trust.
A review of the mass of testimony, reports, recommendations and studies that have been made part of the record since the present account was filed has convinced the auditing judge that there is no real consensus among the interested parties and organi *702 zations on these issues. This conclusion is not surprising, in view of the troublesome ambiguities in the language Mr. Barnwell used. Nevertheless, if the court is to fulfill its responsibilities in this case, a further analysis and reconciliation of the views of all concerned seems necessary if we are to develop a viable set of guidelines for the future administration of this trust.
Mr. Wagner filed his supplemental report on May 12, 1971, and we believe that he has completed his assignment admirably and with distinction. He held two hearings, on May 28, 1970, and October 28, 1970. At the time of the first hearing, the market value of the trust principal was $429,000, which produced an estimated gross income of $23,500 per year. At that time, there was an accumulated income account of $96,000, producing annual income of about $4,600.
At the first hearing, Mr. Wagner reviewed the history of this trust and the difficulty that had been experienced in attempting to arrive at definitions for the terms used by Mr. Barnwell in his will. It may be well to quote from the statement he made tó the interested parties who had assembled for that hearing:
“I think we are all agreed — and I think everyone who has been in the case has agreed — that the language in the will is so vague that it almost defies definition, and this has probably been the stumbling block throughout in trying to establish guide lines as requested by counsel for the trustee when this account was originally filed for audit. Nevertheless, as I said in my last report, there is the feeling that if Barnwell is not to follow the route of cy pres, there must be some relationship between the use of the funds in this trust and the purposes set forth in the will. The Court has indicated that it will not accept the suggestion made in the broadest sense in prior discussions that what is good for Central High School necessarily produces *703 students and gratuates of higher honor and moral courage. As I think both reports have said — and I believe Judge Klein agrees on this — the record so far does not establish a connection between a fine school in terms of physical plant and ability to educate and the honor and moral courage of the students at the school. Beyond the record there is some feeling that common experience does not support such connection.
“The following two axioms are suggested for your consideration: that those who give of themselves unselfishly are demonstrating the highest principles of honor and moral courage; and those who successfully overcome adversity and physical or mental handicaps are demonstrating the highest principles of honor and moral courage.”
In his report Mr. Wagner quotes with approval from the presentation made by Mr. Howard Carlisle, President of Central High School, at the hearing on October 28,1970, as follows:
“What has been most elusive, of course, has been a clear definition of the terms ‘honor’ and ‘moral courage.’ I would like to suggest that moral courage’ suggests a variety of possibilities, such as perseverance in the face of adversity, espousing an unpopular viewpoint when it would be easier to conform to majority thinking, or, conversely, refusing to conform when it would be contrary to one’s personal ethics to do so, or having the persistence to be a pioneer when the dangers or obstacles are unknown. So far as ‘honor’ is concerned, and I believe that this has received less attention than it should, the dictionary has nearly a dozen and a half definitions. I prefer the one that calls for an ‘acknowledgment of personal responsibility for one’s actions,’ and, since actions cannot be meaningful except as they affect others, this means a sense of responsibility for one’s fellow-man.”
The bulk of Dr. Carlisle’s presentation consisted of a *704 recapitulation and justification of the purposes for which Barnwell funds were spent in past years. With some of these purposes Mr. Wagner takes issue and after our own detailed examination of the evidence at hand, we think he has done so with good cause.
The record clearly documents the proposition that for many years little effort has been made to seek out and develop new uses for Barnwell funds despite the drastic and far-reaching changes that have been taking place in the urban community served by Central High School. The social and economic problems which beset us, seemingly so insoluble, cry out for new approaches and new remedies. Central High School has not been able to remain aloof from these troublesome matters. These have, without doubt, been contributing factors that have caused the school to engage, for the past several years, in a struggle for its very existence as an institution of the highest academic standards. For a time it seemed to be losing that battle, but just within the past year a concerted effort by alumni, students, parents and teachers has apparently succeeded in restoring, in a large measure, the high pupil admission standards that were being gradually eroded.
Although the future of Central High School as an academic school now seems assured, it must continue to come to grips with the big city problems of poverty, drugs, violence and race relations. These have an impact on this school as they do on all others in Philadelphia and in the metropolitan centers of the nation. The problems are difficult and the solutions are not easy. Doubtless it will be a long time before they are solved. Recognizing that this is so, it seems to us that it is in these areas Barnwell funds could perhaps make a small but significant contribution, entirely consistent with the basic purposes Mr. Barnwell had in mind.
When we examine the programs that have absorbed the income from this trust in recent years, we must *705 conclude that testator’s intentions, albeit poorly defined, are being honored as much in the breach as in the observance. The trustee properly recognizes that the language used by Mr. Barnwell gave it the widest discretion to implement his basic purpose of encouraging and rewarding the highest principles of honor and moral courage. Yet the very fact that it was felt necessary to seek guidance from the court reflects uncertainty as to the way in which that discretion has been exercised in the past. See, for example, page three of the “Response” of the trustee to the report of the amicus curiae where it is said:
“. . . the Trustee and its counsel have realized from the outset that the traditional uses of Barnwell funds are seriously challenged. In fact, this proceeding was initiated because the Trustee was concerned whether the purposes for which it was being asked to spend the money had anything to do with honor and moral courage.”
The amicus curiae found, and we think with justification, that the trend has been to stray further and further from Barnwell’s original intention in establishing this trust. The idea that any program that makes Central High School a better school is ipso facto within the scope of the trust seems to have found easy acceptance by the trustee, the alumni and other interested organizations. The fallacy of this theory is aptly stated by the amicus curiae at page 11 of his report:
“The Amicus does not deem it necessary to engage in analysis and arguments as to the meaning of the words in Mr. Barnwell’s Will. He deems it sufficiently established and sufficiently clear, despite the admitted weaknesses of the Will itself, that the purpose of this Trust is practically to encourage and reward the practice of certain aspects of human character in the students and graduates of Central High School. It must *706 be emphasized again that Mr. Barnwell did not directly credit Central High School or the school system with developing these characteristics in him. He gave the credit for that to his mother. By his Will he sought to enable his Trustee to accomplish with others something of that character development which he believed his mother accomplished with him.”
Although the amicus curiae has discussed at some length a number of ideas and programs he believes fall within the intended purposes of the trust as well as some that do not, it is clear that it is still the trustee’s responsibility to make the final decisions in the reasonable exercise of its discretion. The amicus curiae has attempted to erect a framework of ideas within which every expenditure from this fund should fall. We think he has done so in a way that will provide the kind of guidelines the accountant has asked for.
In his recommendations, the amicus curiae lists the following basic rules which should apply in the implementation of the charitable purposes of the will:
"a. The Fund must not be used as a substitute for programs which are the responsibility of the Board of Education, whether or not the Board fulfills that responsibility.
“b. The Fund should not be used for capital improvements at the School or elsewhere except to the extent that limited expenditures may be needed to support programs of an innovative nature.
“c. Graduates of the School, heretofore disregarded in the implementation of the trust, are within the class of beneficiaries under the Will, and future programs must include them.
“d. The Fund must be employed so as to permit the widest participation by students and graduates.
“e. The Advisory Committee should be reorganized to broaden participation, and procedures must be established to assure that its role is advisory only.”
*707 The amicus curiae then suggests that all previously recurring expenditures be reviewed by the trustee to assure compliance with the terms of the will. He touches on a number of major programs which have traditionally received support from the fund and tries to apply the foregoing rules to each:
“a. Expenditures for the Library must be reviewed to assure that they are directed to the purposes of the Will and do not merely augment Board of Education appropriations. Guidelines may be found in Mr. Car-lisle’s characterization of the Library as ‘a place where the printed word can quicken one’s awareness of his role and responsibility as a citizen of his community and of the world, fire his imagination, through its description of the accomplishments of others, to strike out into new and challenging areas for the betterment of society, and give him an understanding of human nature upon which he can construct his own ethical and moral codes.’ Support for staffing of the Library should assure that not only purchase of books but use of the Barnwell facility is directed toward such purposes.
“b. Payments toward the Handbook should be reduced so as to constitute a more appropriate portion of total Barnwell expenditures and so as to constitute only a limited share of the total cost of this publication. Support for continuation of the publication should actively be sought from other sources such as the alumni.
“c. The Barnwell Honor Roll and the Barnwell Award are proper expenditures so long as conducted in accordance with the standards stated by Mr. Car-lisle. The Robert Ellis Thompson Honor Prizes are open to serious doubt because they are awarded on the basis of scholarship and thus do not necessarily reflect the attributes of the School President sought to be recognized. [These prizes were established in *708 memory of Robert Ellis Thompson, President of Central High School from 1894 to 1920, who, according to Dr. Carlisle, was ‘one of the greatest practitioners of honor and moral courage.’]
“d. Partial subsidization of the undergraduate newspaper and magazine appears justified.
“e. The several luncheons, dinners and events at which achievements of undergraduates are recognized are appropriate and should be expanded to recognize achievements of graduates.
“f. The Amicus recommends that the Trustee terminate:
“i. All expenditures for equipment and supplies which augment Board of Education appropriations.
“ii. All payments for the use of departments of the School which augment Board of Education appropriations.
“in. Support of undergraduate clubs.
“iv. Membership fees and expenses of faculty and staff.”
In the “Response” to the report of the amicus curiae, the trustee, while not objecting to the report, comments on some of the observations made therein. Among these comments there are two which should be noted. One has to do with a theme that recurs frequently in the report and is the first of the basic rules suggested by the amicus curiae, supra, namely, that “the Fund must not be used as a substitute for programs which are the responsibility of the Board of Education, whether or not the Board fulfills that responsibility.” At pages three and four of the “Response” we find the following: “. . . the Trustee has always felt that Barnwell funds should not be spent merely to make life easier for the Board of Education. A difficulty is that almost any program which is desirable could be an obligation of a school board. As Dr. Comog [a former president of Central High School] testified (N.T. 187-188):
*709 ‘A. Yes, but your Honor he is posing a situation where it could be conceived that certain types of equipment or supplies shouldn’t be the obligation of the School Board and yet if they are to be purchased, obviously they are to be purchased for the benefit of the education of the youth in that school. Now why should they be purchased for the benefit of the education of the youth in that school and not be the obligation of the School District?’
“We submit the principle is obvious and easy to state: the problem lies in the application. These days, when it is clearly obvious that the Board of Education not only will not, but cannot, furnish certain services, it would seem to the Trustee a more realistic test should be applied than in the case of the ideal school board with unlimited funds envisioned by Dr. Cornog.”
To resolve this conflict would require an extended discussion of what constitutes the “responsibilities” of the Board of Education, and this we are not prepared to do. It does seem apparent in these days of fiscal woes, that such responsibilities may change from day to day depending upon what money is in the till. Accordingly, we are inclined to the view expressed by the trustee, that a pragmatic, realistic approach is essential if we are not to become embroiled in meaningless argument as to where the “responsibility” for a particular program lies. In one sense, we might consider this a kind of academic argument, because we would venture to suggest that there are few programs which are the responsibility of the Board of Education that can be categorized as encouraging and rewarding the practice of the highest principles of honor and moral courage. We believe, therefore, that where a program clearly falls within the guidelines we have been discussing, the trustee may exercise its discretion in determining to what extent Barnwell funds may be used.
*710 The second comment of the trustee to which we wish to allude concerns the use of Barnwell funds for the support of undergraduate clubs. The amicus curiae suggests such use be terminated, presumably because these clubs are encouraged by the Board of Education and supported by its funds. The trustee, on the other hand, states that it “. . . feels strongly that support for undergraduate clubs should not be ruled out categorically. As an extra curricular activity, participation in club activity — depending upon the nature and purpose of the particular group — could recognize or encourage the development of the qualities admired by Barnwell.”
Here again, it seems to us that unless we define what we mean by “undergraduate clubs” we may not be talking about the same thing. It is quite conceivable that the current financial crisis of the Board of Education may result in a complete suspension of support for clubs included as part of the school program. Furthermore, there may be other clubs which clearly fall within the guidelines laid down by the amicus curiae which receive little or no support from the board. We think it is a dangerous simplification to imply that all undergraduate clubs are of the same nature and should be treated alike. We would prefer that the trustee exercise its discretion in applying the guidelines to such clubs in the same manner as it does to any other program.
At the final hearing in this matter held on June 15, 1971, Mr. Wagner indicated that the guidelines must be flexible. His comment was: “I have tried to be broad and yet get a little direction in the operation of the trust. I think it is inevitable that what is done today will not necessarily be true in the future.”
At that hearing, representatives of the Attorney General’s office, the alumni, the parents’ group and *711 the graduates of Central High School expressed general agreement with the approach taken by the amicus curiae in this very difficult trust. It is fair to say that there was a feeling that sensitive implementation of his recommendations will bring the use of Barnwell funds more nearly in line with what the testator intended.
Mr. Wagner’s report contains an extended discussion of a proposal for the use of Barnwell funds to develop park land near Central High School to encourage intramural competitive athletics. This project has generated strong differences of opinion as to its desirability at this time. In his report the amicus curiae has reviewed the pros and cons in some detail and concluded that although the use of Barnwell funds for this purpose is entirely proper “he should neither approve nor disapprove the expenditure of a certain number of dollars for a specific project.” We agree, since this is a matter solely within the discretion of the trustee. We would expect, however, that the trustee will make its own investigation of this proposal and solicit the recommendations of the expanded Advisory Committee suggested in Mr. Wagner’s report before reaching a decision as to what action would best serve the welfare of the students at the school.
Our discussion herein points up the burden of the trustee in seeking to carry out Barnwell’s wishes. The ambiguities in the language he used have created difficulties for the trustee in exercising the discretion given to it by the will as well as for this court in its search for a construction that best reflects his intention. This raises the question of equitable compensation to the trustee, a matter that was raised in its statement of proposed distribution and was considered in the report of A. David M. Speers, amicus curiae. The *712 trustee and Mr. Wagner, at the hearing on June 15, 1971, submitted a stipulation, based on Mr. Speers’ recommendations, that the trustee be compensated in the sum of $4,200 for past services, and beginning with the fiscal year starting July 1,1971, compensation be at the rate of five percent of income, plus $1,000 per annum, without prejudice to the right of the trustee to additional compensation if it can be justified at a later audit.
The firm of Pepper, Hamilton & Scheetz, as counsel for the trustee in these proceedings, requested compensation in the sum of $15,000. The firm of Duane, Morris & Heckscher requested compensation of $8,000 for the services of A. David M. Speers, deceased, as first successor amicus curiae, and $4,000 for the services of Seymour C. Wagner as second successor amicus curiae.
The auditing judge is of the opinion that the compensation requested by the trustee is fully justified by the exceptional demands made upon it in carrying out its duties under the trust. There was no objection by any party in interest to this request or to the compensation requested for counsel and the amici curiae. Accordingly, all such requests for compensation are hereby approved.
The accountant has filed two supplements to the original account now being audited. The second supplement is stated from December 5, 1969, to May 21, 1971, and shows a balance of income of $116,651.31. This large accumulation is the result of the trustee’s understandable reluctance to undertake new programs or expand old ones while this audit was pending. However, we are now faced with the uncertainties created by *713 the Tax Reform Act of 1969 which, inter aha, prohibits any farther accumulations subsequent to December 31, 1969. In a letter dated June 23, 1971, the trustee states that as of December 31, 1969, there was in the income account a total of $102,198.68. By paying from the income account the cost of filing the account, fees to counsel and the amici curiae, as well as the additional compensation of $4,200 to the trustee, it will be reduced to less than the $102,198.68. We will direct that the balance remaining, not to exceed the latter sum, should be held by the trustee and invested and reinvested as an income reserve account, the income therefrom and the principal, if necessary, to be used for the purposes of the trust.
Mr. Wagner recommended that the trustee be directed to file accounts at periodic intervals. As he put it:
“In an era of rapid social changes, which are perhaps more evident in the scholastic environment than anywhere else, it is inevitable that the recommendations of today may not suit the conditions of tomorrow or the day after. The ability to change the programs underwritten by the Barnwell Foundation is a sine qua non to the implementation of testator’s intent that the students and the graduates of Central High School continue to realize the same potential as their predecessors who attended this exceptional school.”
At the hearing on June 15, 1971, Mr. Maloney suggested the next accounting to be filed at the end of three years. We will direct the trustee to file an account no later than 10 years from the date of this adjudication, or sooner if the trustee deems it advisable.
And now, July 9, 1971, the account is confirmed nisi.